**SEIDEN ASSOCIATES, INC.,**
Plaintiff–Appellant,

v.

**ANC HOLDINGS, INC., American National Can Co., Defendants–Appellees.**

**No. 656, Docket 91–7770.**

United States Court of Appeals, Second Circuit.

Argued Dec. 10, 1991.
Decided March 23, 1992.

**426**

Daniel A. Pollack, New York City (Edward T. McDermott, Pollack & Kaminsky, of counsel), for plaintiff-appellant Seiden Associates, Inc.

Jeremy G. Epstein, New York City (Michael W. Jahnke, James R. Warnot, Jr., Shearman & Sterling, of counsel), for defendants-appellees ANC Holdings, Inc. and American Nat. Can Co.

Before: FEINBERG, NEWMAN and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

The appeal before us presents a question of contract interpretation. When the meaning of a contract is litigated, a reviewing court ordinarily looks only at the words used by the drafters, who presumably understood what they intended. Where the language used creates an ambiguity, a reviewing court must permit the receipt of evidence in order to see what was in the drafters' minds. Plaintiff Seiden Associates, Inc. (Seiden) commenced this action to recover unpaid fees it claimed to have earned when, pursuant to an agreement, it recruited William Sick, Jr. as chief executive officer of defendant American National Can Company (National Can). Seiden appeals from an order entered on July 3, 1991 in the United States District Court for the Southern District of New York (Mukasey, J.), granting summary judgment in favor of National Can and defendant ANC Holdings, Inc. (ANC), the successor-in-interest to Triangle Industries, Inc. (Triangle), the original party to the agreement.

## BACKGROUND

Seiden is a New York executive recruiting firm. On December 2, 1986 it entered into a contract dated October 31, 1986 with Triangle to recruit a chief executive officer for Triangle's container business, National Can. The letter agreement entered into by Seiden's president, Steven Seiden, and Triangle's president, Peter May, set forth the following:

> Our fee for this assignment, which shall be an exclusive one, will be equivalent to 30% (thirty percent) of the executive's first year's earned base and incentive compensation, reduced by the paid portion of our retainer but not lower than the total retainer, as set forth in the

following paragraph. The final fee will be determined 12 months from the date of employ.

As such retainer, Triangle Industries Inc. agrees to pay Seiden Associates $300,000 (three hundred thousand) in five equal monthly payments of $60,000 (sixty thousand) beginning on the date this letter is signed by you. This retainer is based on 30% of the Chief Executive Officer's initially estimated first year's total cash compensation of $1 million.

After reviewing more than 100 candidates, Seiden recruited Sick and assisted the executive in negotiating with Triangle for the terms of his employment. Sick began employment with National Can on January 1, 1988 with a five-year contract that provided him with an annual salary of $800,000. In addition, he was eligible to receive cash incentive compensation from a deferred Performance Incentive Plan, which did not vest until his third year of employment, and to participate in two stock option plans. Most significant for purposes of this appeal, the agreement provided for a discretionary "cash bonus award up to an amount equal to 100% of the actual salary payable ... for such year. The amount of any such award shall be based upon the achievement, as determined by the Company's Board of Directors in the exercise of its reasonable judgment" of yearly company and personal performance goals and "shall be payable in a lump sum on or before each April 1 for the immediately preceding calendar year." During 1988 Triangle and its subsidiaries, including National Can, were purchased by the Pechiney Group. Pechiney is the parent of ANC, the successor-in-interest to Triangle.

Sick's 1988 W–2 income statement shows that he received $800,004 in salary, $4,700 for tax preparation, $173,437.50 for stock options, and $45,189.67 for moving expenses. Total earnings received during the 1988 calendar year therefore were $1,023,-331.17. On March 1, 1989 the Chairman of Pechiney granted Sick a discretionary bonus of $1 million as compensation for services performed during 1988. An annual report on Form 10–K, submitted to the Securities Exchange Commission by Trian-

gle Holdings, another successor-in-interest of Triangle, lists executive compensation for 1988, and indicates that Sick's total cash compensation paid in 1988 was $2,041,206, apparently reflecting all compensation eventually paid, except moving expenses, including the discretionary bonus received in 1989 and employer pension contributions.

Based upon the 10–K report, Seiden claimed a recruitment fee of 30 percent of the earned compensation paid for 1988 ($2,041,206) or $612,361.80, of which it had already received $300,000 under the retainer letter. The instant litigation arises over the $312,361.80 balance. ANC and National Can argue that the contract provides that Seiden's final fee was to be determined 12 months from the "date of employ" or on January 1, 1989. They urge that only payments made before December 31, 1988—the $800,004 paid in cash compensation as salary—is relevant in computing the recruitment fee. ANC contends the nonrefundable retainer of $300,000 exceeds 30 percent of $800,004 ($240,001.20), by about $60,000, and as a consequence it owes Seiden nothing further. The employer defendants further assert that the contract term "incentive compensation" referred to other cash incentives available to Sick and other National Can executives, but did not include the March 1989 $1 million discretionary bonus. In the event ANC is held not bound by the written contract between Triangle and Seiden, plaintiff alleged alternative claims in its complaint based upon unjust enrichment and quantum meruit.

The parties filed motions for summary judgment and the district court ruled in favor of defendants ANC and National Can on July 3, 1991. It determined that the language of the contract unambiguously required that only compensation payments ascertainable before December 31, 1988 were relevant to the calculation of Seiden's recruitment fee. Because it found that the language of the contract was unambiguous, the district court refused to consider plaintiff's proffer of extrinsic evidence of the parties' intent. Hence, the $1 million

discretionary bonus paid by the defendant to Sick in March of 1989 was not factored into the computation of the final fee owed plaintiff. Since ANC's status as a party was derived as a successor-in-interest to Triangle, plaintiff's unjust enrichment and quantum meruit claims were dismissed. Seiden appeals. We reverse.

## DISCUSSION

### A.

Appellant challenges the grant of summary judgment to defendants, which it contends flowed from the trial court's erroneous conclusion that the terms of the contract were unambiguous. It was the absence of ambiguity that the district court relied on in precluding the receipt of extrinsic evidence, which Seiden believes would have shed light on the original parties' intent in signing the letter agreement of December 1986. The rules of construction in this area of contract law are well known.

■■ In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use. *See Slatt v. Slatt*, 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (1985). When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity. *See Heyman v. Commerce and Industry Co.*, 524 F.2d 1317, 1320 (2d Cir.1975); *Painton v. Company & Bourns, Inc.*, 442 F.2d 216, 233 (2d Cir.1971). Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate, *see Heyman*, 524 F.2d at 1320; *Painton*, 442 F.2d at 233; *cf. Antilles Steamship Co., Ltd. v. Member of the American Hull Insurance Syndicate*, 733 F.2d 195, 202 (2d Cir.1984) (Newman, J., concurring) (ambiguity in a contract, *in the absence of relevant extrinsic evidence*, presents a question of law),

since it is only when there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

■■ In the past, we have defined ambiguous language as that which is " 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' " *Walk-In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987) (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y.1968) (Mansfield, J.)). Conversely, language is not ambiguous when it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion.' " *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)). The language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view "strain[s] the contract language beyond its reasonable and ordinary meaning." *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957).

■■ If the language unambiguously conveys the parties' intent, extrinsic evidence may not properly be received, nor may a judicial preference be interjected since these extraneous factors would vary the effect of the contract's terms. *See Metropolitan Life Ins. Co. v. RJR Nabisco Inc.*, 906 F.2d 884, 889 (2d Cir.1990) (Given agreement by the parties, courts should not change terms or allow them to be violated.); *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566

N.E.2d 639 (1990); *Teitelbaum Holdings, Ltd. v. Gold,* 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 396 N.E.2d 1029 (1979).

If ambiguity is found, it must be resolved—as well as all inferences drawn—against the moving party, which has the burden of establishing that no facts material to the outcome of the litigation are in dispute. *See United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) *(per curiam); Curry Road Ltd. v. K Mart Corp.,* 893 F.2d 509, 511 (2d Cir.1990); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir. 1987). In such case extrinsic evidence may properly be considered in the search for the contracting parties' intent. *See, e.g., Curry Road Ltd.,* 893 F.2d at 511.

Under New York law whether the language of a contract is unambiguous and, if so, what construction is proper, are legal questions, *see United States Naval Institute v. Charter Communications, Inc.,* 875 F.2d 1044, 1048 (2d Cir.1989); *Slatt,* 64 N.Y.2d at 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099; *Sutton v. East River Savings Bank,* 55 N.Y.2d 550, 554, 450 N.Y.S.2d 460, 435 N.E.2d 1075 (1982), subject to *de novo* review. Hence, considering the question of Seiden's fee, we must decide whether the language of the contract *and* the inferences to be drawn from it, *Cable Science Corp. v. Rochdale Village, Inc.,* 920 F.2d 147, 151 (2d Cir.1990), are susceptible to more than one reasonable interpretation. *See Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 26 (2d Cir.1988). Contrary to the conclusion of the trial court, we find the contract susceptible to more than one reasonable reading.

### B.

The dispute in the instant litigation centers on the "earned compensation provision" and the "final fee provision." The earned compensation provision declares that the recruiting fee "will be equivalent to 30% of the executive's first year's *earned* base and incentive compensation...." (emphasis added). The final fee provision states "[t]he *final* fee will be determined 12 months from the date of employ." (emphasis added). Had all compensation earned by Sick during 1988 been paid prior to December 31 the effect of these two parts of the contract would have been unremarkable. But since compensation was paid to Sick after the end of the year 1988, when the final fee was to be determined, the effect of the two provisions conflict with one another. We see two possible readings—each of which denigrates the plain meaning of the other: either the discretionary bonus—though indisputably earned by Sick during 1988—is not considered when calculating the recruiting fee, or the recruiting fee is not finally determined as of December 31, 1988.

In finding the contract's language unambiguous, the district court observed that the contract explicitly states that only those items of Sick's first year's earned base and incentive cash compensation that were ascertainable 12 months from Sick's date of employ are relevant to the calculation of Seiden's fee. It noted further that the latter phrase, that is, the final fee provision is critical. The fact that each provision when read separately may be unambiguous does not necessarily mean that when read together they will be. Although the interrelationship of the two phrases ascribed by the district court is not unreasonable, it erroneously emphasized the import of the final fee portion at the expense of the earned compensation portion of the letter contract and thereby ignored alternative reasonable interpretations of how the two provisions interrelate.

No principled reason supports a conclusion that the final fee phrase is more crucial to a reading of the contract than the earned compensation language. By reading it as intending that the only relevant compensation is that ascertainable on December 31, 1988, the clear understanding that the recruitment fee be equal to 30 percent of Sick's *earned* compensation for 1988, rather than 30 percent of his compensation *received by December 31, 1988,* is unwarrantedly neglected. Similarly, had the district court determined, in disregard of the final fee provision, that the earned compensation provision was crucial and re-

quired a recruiting fee equal to 30 percent of all compensation earned whenever paid, it would improperly have ignored the plain meaning of the final fee wording and the ambiguous interrelationship between the two phrases. How the contracting parties intended the two phrases to interrelate is not evident from examining only their language. Thus, their relationship to one another is not clear.

The earned compensation paid Sick after December 31, 1988 caused these two portions of the employment contract to become indefinite and conjectural. As a result, reasonable minds may differ as to what was intended. That the final fee wording could mean only that the parties agree to meet on that date to commence the process of discussing the final fee, as Seiden argues, is not an unreasonable view of the language's meaning. Nor is it unreasonable to construe the same words to mean that the final fee would not be determined before that date, and that it could be determined finally on that date only were Sick ineligible for any further compensation. And, it would not strain the contract's language beyond a reasonable and ordinary intent to view it as requiring the payment of a final fee equal to 30 percent of all compensation received by December 31, 1988, subject to an additional payment in the event that compensation earned during 1988 is awarded and received after that date.

In sum, because the interrelationship of the two provisions in the letter agreement is susceptible to several reasonable interpretations, the contract is ambiguous. It cannot be definitely and precisely gleaned which reading was intended by the parties. Because of the presence of an ambiguity, an opportunity to present extrinsic evidence must be afforded to establish what the original contracting parties intended.

## CONCLUSION

Accordingly, the judgment appealed from is reversed and the matter is remanded to the district court for further proceedings consistent with this opinion.