**SARINSKY'S GARAGE INC., Plaintiff,**

v.

**ERIE INSURANCE COMPANY and Erie Insurance Company of New York, Defendants.**

**No. 08 Civ. 5247(SCR)(PED).**

United States District Court, S.D. New York.

March 2, 2010.

Kevin Daniel Bloom, Bloom and Bloom, P.C., New Windsor, NY, Robert Nathan Isseks, Middletown, NY, for Plaintiff.

Marco Cercone, Rupp, Baase, Pfalzgraf, Cunningham & Coppola, LLC, Buffalo, NY, for Defendants.

## OPINION AND ORDER

STEPHEN C. ROBINSON, District Judge:

Sarinsky's Garage Inc. ("Plaintiff") commenced this action against Erie Insurance Company and Erie Insurance Company of New York (collectively, "Defendants") for breach of contract on a commercial property liability insurance policy, seeking $104,198.44 and a declaratory judgment. Plaintiff commenced a state court action on April 28, 2008, and Defendants subsequently removed the action to this Court on the grounds of diversity jurisdiction, pursuant to 28 U.S.C. § 1332. The parties have filed cross-motions for summary judgment without seeking discovery. This Court held oral argument on the cross-motions for summary judgment on February 9, 2010. For the reasons discussed herein, Defendants' motion for summary judgment is GRANTED and Plaintiff's cross-motion for summary judgment is DENIED.

## I. BACKGROUND

In 2006, Plaintiff, an automobile repair/used car sales shop, purchased Defendants' commercial property liability policy ("Policy") along with Defendants' "Auto Repair Shops Erieplaceable Enhancements Endorsement" ("Enhancements Endorsement") for Plaintiff's property located in New Windsor, New York. See Pl. R. 56.1 Stmt. ¶¶ 1–2; Def. R. 56.1 Stmt. ¶¶ 1–2. The Policy provided coverage for the period from May 1, 2006, to May 1, 2007, in the amounts of $527,500, $220,000, and $300,000 on Defendants' "Buildings," "Business Personal Property and Personal Property of Others," and "Income Protec-

tion," respectively. See Pl. R. 56.1 Stmt. ¶ 3; Def. Resp. to Pl. R. 56.1 Stmt. ¶ 3.

In September or October 2006, Plaintiff submitted a claim to Defendants for costs Plaintiff sustained as a result of a petroleum leak from an underground storage tank on its premises. See Pl. R. 56.1 Stmt. ¶¶ 4–5; Def. R. 56.1 Stmt. ¶ 3. In response, Defendants sent Plaintiff a reservation-of-rights letter dated October 16, 2006, indicating that Defendants needed to investigate whether any coverage was available for the loss in question. See Pl. R. 56.1 Stmt. ¶ 6; Def. Resp. to Pl. R. 56.1 Stmt. ¶ 6. Upon completion of Defendants' investigation, on March 12, 2007, Defendants sent Plaintiff a check in the amount of $20,000. See Pl. R. 56.1 Stmt. ¶ 8; Def. R. 56.1 Stmt. ¶ 5.

Defendants contend that the $20,000 payment was made in full satisfaction of Defendants' contractual duties. See Def. Mem. of Law at p. 5. Plaintiff, however, alleges that it is entitled to additional relief for the remainder of the remediation costs of $104,198.44. See Pl. Mem. of Law at p. 3.

## II. STANDARD OF REVIEW

 Under New York law,[1] insurance contracts must be construed to give effect to the intent of the parties, as expressed in the plain meaning of the contract language. See Morgan Stanley Group Inc. v. New England Ins. Co., 225 F.3d 270, 275 (2d Cir.2000). Where the contract language is wholly unambiguous, summary judgment is appropriate. See Burke v. Ulico Cas. Co., 165 Fed.Appx. 125, 126–27 (2d Cir.2006). Where the language is ambiguous, however, the contract's meaning generally becomes an issue of fact, thereby precluding summary judgment. See id.

---

1. The parties agree that New York law governs the contract dispute at issue. See Def. Mem. of Law at p. 7; Pl. Mem. of Law at p. 3.

The key question of whether the contract language is ambiguous is a question of law to be decided by the court. *See Morgan Stanley*, 225 F.3d at 275.

▮ A contract is ambiguous if the terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (internal quotations omitted). Parties, however, may not create an ambiguity merely by urging conflicting interpretations of the contract. *See Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992). In reviewing multiple contract interpretations, the court need not determine which is the most likely interpretation, but only whether each is sufficiently reasonable to render the contract ambiguous. *See Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 115 (2d Cir.1994).

▮ Although interpretation of an ambiguous contract is generally a question of fact to be resolved by the factfinder, summary judgment nevertheless may be appropriate where the court is able to resolve the ambiguity through a legal, rather than factual, construction of the contract terms. *See Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir.1999). Where a contract is ambiguous, the parties may present extrinsic evidence regarding their actual intent. *See id.* The court may resolve the ambiguity as a matter of law if the extrinsic evidence is "so one-sided that no reasonable person could decide the contrary." *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47 (2d Cir.1999) (internal quotations omitted). If it is not, the extrinsic evidence must be interpreted by the factfinder.

*See Williams & Sons Erectors, Inc. v. South Carolina Steel Corp.*, 983 F.2d 1176, 1183–84 (2d Cir.1993). Where the ambiguity cannot be resolved by examining extrinsic evidence of the parties' intentions—either as a matter of law or as a matter of fact—the court should construe the ambiguous language in accordance with the rule of *contra proferentem*, a rule of contract construction which requires the court to construe the contract against the insurer. *See Morgan Stanley*, 225 F.3d at 276; *see also Williams & Sons Erectors*, 983 F.2d at 1184 ("Ambiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on.").

▮ In addition, where an insurer seeks to negate coverage by virtue of an exclusion in the policy, a heavy burden is placed on the insurer to "establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Parks Real Estate Purchasing Group v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir.2006) (internal quotations omitted).

## III. DISCUSSION

▮ The Policy specifically states that it does not cover "[t]he cost of excavations, grading, backfilling or filling;" "[t]rees, shrubs, lawns, and plants, except as provided in Extensions of Coverage;" and "[l]and (including land on which covered property is located)." *See Pl. Mem. of Law at Exh. C ("Policy") at SECTION 1—COVERAGES; BUILDING(S)—COVERAGE 1; B. Property Not Covered. Under the Extensions of Coverage, which is defined as an additional amount of insurance that increases the total amount of insurance available for the coverage involved, the Policy "cover[s] the cost to extract 'pollutants'

from land or water on the insured premises if the release, discharge or dispersal of 'pollutants' is caused by a peril insured against during the policy period," for up to $10,000 for all "losses" through the year. *See* Policy at SECTION VIII— EXTENSIONS OF COVERAGE; B. Extensions of Coverage; 25. Pollutants Clean Up and Removal. An enhancement to the Policy increased this $10,000 coverage to $20,000. *See* Policy at AUTO REPAIR SHOPS ERIEPLACEABLE ENHANCEMENTS ENDORSEMENT ("Enhancements Endorsement") at ¶ D. Further, the Enhancements Endorsement specifically excludes coverage for "[d]ischarge, dispersal, seepage, migration, release, or escape of 'pollutants' unless the discharge, dispersal, seepage, migration, release, or escape is itself caused by a peril insured against." *See id.* at ¶ F.1.e.B.8. The Enhancements Endorsement also states that "if 'loss' or damage by a peril insured against results from the discharge, dispersal, seepage, migration, release, or escape of 'pollutants,'" the insurer "will pay for the resulting damage caused by the peril insured against." *See id.*

There is no dispute that there was a petroleum leak from an underground storage tank on Plaintiff's premises. *See* Def. Mem. of Law at p. 12. Plaintiff claims that the total amount of loss from the leak was $139,500.87, representing $35,302.43 for the extraction of pollutants (*i.e.* the petroleum) and the balance of $104,198.44 for the costs of, *inter alia,* the detoxification and transportation of the surrounding dirt, landscaping, and macadam replacement. *See* Pl. Mem. of Law at p. 2. Defen-

dants concede that the petroleum leak constituted a discharge of pollutants caused by a peril insured against and accordingly paid Plaintiff $20,000 for the costs of extracting the petroleum from the land, as provided for under the Extensions of Coverage. *See* Def. Mem. of Law at pp. 12–13. Defendants assert that the $20,000 coverage is all of the coverage to which Plaintiff is entitled. *See id.* Plaintiff, however, claims that it is also entitled to recover the costs of the detoxification and transportation of the surrounding dirt, landscaping, and macadam replacement. *See* Pl. Mem. of Law at pp. 3–8.

Plaintiff contends that the underground storage tank that leaked was a "fixture," which is covered under the Policy.[2] *See id.* at p. 4. Accordingly, Plaintiff argues, the Policy's exclusion for loss relating to land does not apply, since the Policy makes clear that "if 'loss' or damage by a peril insured against results from the discharge, dispersal, seepage, migration, release, or escape of 'pollutants,'" then such loss will be covered. *See id.* at p. 5 (quoting Enhancements Endorsement at ¶ F.1.e.B.8[3]). In other words, since the petroleum leak was caused by the storage tank, a peril insured against, the exclusion for loss to land does not apply and Plaintiff's recovery for non-extraction remediation costs is limited only by the base coverage amount of the Policy—*i.e.* the $527,500 coverage on "fixtures." *See id.* at p. 7. Plaintiff interprets the $20,000 limit stated in the Extensions of Coverage to apply only to extraction costs and not to cap the amount that an insured can collect for remediation costs unrelated to extraction,

---

**2.** Plaintiff relies upon New York law for its argument that the underground storage tank constitutes a "fixture," since the term is not defined within the Policy. *See* Pl. Mem. of Law at p. 4.

**3.** Plaintiff cites to ¶ F.1.e.A.8 of the Enhancements Endorsement for this provision, but it appears that such provision does not exist and that Plaintiff instead has combined two other provisions. Plaintiff quotes language from ¶¶ F.1.e.A and F.1.e.B.8 of the Policy.

such as costs of detoxification and transportation of the surrounding dirt, landscaping, and macadam replacement. *See id.*

Defendants, in contrast, interpret the Policy and the Enhancements Endorsement, read together, to provide coverage only for the costs of extracting pollutants. *See* Def. Mem. of Law at pp. 12–13, 15. Defendants contend that neither the Policy nor the Enhancements Endorsement provide coverage for non-extraction remediation costs, and thus Plaintiff is not entitled to coverage for detoxification and transportation of the surrounding dirt, landscaping, and macadam replacement. *See id.* Defendants alternatively argue that the costs of detoxification and transportation of dirt, landscaping, and macadam replacement are costs associated with the extraction of pollutants, and therefore, such remediation costs would be subject to the $20,000 cap for the extraction of pollutants, even if non-extraction remediation costs generally are not excluded by the terms of the Policy. *See* Def. Mem. of Law in Opp. to Pl. Cross–Mot. at p. 11. Defendants assert that their interpretation is not affected by whether the storage tank constitutes a fixture because even if the storage tank is considered covered property under the Policy, it is subject to the terms of the Policy, including the exclusion pertaining to land. *See* Def. Reply Mem. of Law at p. 4. Nevertheless, Defendants challenge the relevance of whether the storage tank is itself covered, since Plaintiff is seeking costs related to contaminated land, rather than costs for damages to the storage tank. *See id.*

This Court finds that, with respect to the loss at issue, the Policy and the Enhancements Endorsement provide coverage only for the costs of extracting pollutants from land, up to $20,000. Section I of the Policy makes clear that losses to land, *inter alia,* are not covered. While the Extensions of Coverage subsequently add back limited coverage for costs to extract pollutants from land under delineated circumstances, nowhere does the Policy or the Enhancements Endorsement otherwise add back coverage for non-extraction remediation costs related to land. Accordingly, the Policy and the Enhancements Endorsement must be read to unambiguously exclude all coverage for losses to land, except for the extraction costs specified in the Extensions of Coverage. Read in such a way, it does not matter whether the costs of detoxification and transportation of the surrounding dirt, landscaping, and macadam replacement for which Plaintiff seeks recovery are considered extraction costs—either they are extraction costs and recovery is capped at the $20,000 that has already been paid under the Extensions of Coverage, or they are not extraction costs and recovery is precluded by the exclusion for loss relating to land.[4]

The contrary interpretation urged by Plaintiff—that the costs are non-extraction remediation costs which are covered because the storage tank is a fixture and therefore a peril insured against within the meaning of the coverage provided under the Enhancements Endorsement—is a contorted reading that requires ignoring the Policy provision excluding coverage for land. This Court cannot consider an interpretation that ignores a key Policy provision to be reasonable. *See RJE Corp. v. Northville Indus. Corp.,* 329 F.3d 310, 314 (2d Cir.2003) (In assessing ambiguity, courts must "consider the entire contract

---

4. This Court, therefore, need not decide whether the costs of detoxification and transportation of dirt, landscaping, and macadam

replacement are properly considered extraction or non-extraction remediation costs.

to safeguard against adopting an interpretation that would render any individual provision superfluous." (internal quotations omitted)). Even assuming *arguendo*,[5] that the storage tank does constitute a fixture and is covered property, damage resulting from the storage tank still would be subject to the Policy's exclusions, and thus Plaintiff could not recover for non-extraction remediation costs related to land.

This Court finds support for its interpretation in *White v. Rhodes*, 34 A.D.3d 951, 823 N.Y.S.2d 786 (N.Y.3d Dep't 2006). In *White*, the plaintiff sought to recover for damages and cleanup costs after a vehicle crashed into an above-ground storage tank on the plaintiff's property, causing the storage tank to rupture and spill oil into the land. *See id.* at 951, 823 N.Y.S.2d 786. By the time of the appeal to the Third Department, it was undisputed that the plaintiff's policy did not cover the cleanup costs of the oil contamination, given the policy language that the policy did not cover the costs of extracting pollutants from land; removing, restoring or replacing polluted land; or land (including the land on which the property was located), including excavating, removing, grading or filling land. *See id.* at 952–53, 823 N.Y.S.2d 786. However, the optional, extended coverage insured "against direct physical loss or damage" resulting from vehicles. *See id.* at 953, 823 N.Y.S.2d 786. Accordingly, the trial court partially granted the defendant insurance company's motion for summary judgment, finding that the insurance policy excluded costs related to the extraction of pollutants from the plaintiff's land, and partially denied the motion, based on the extended coverage

under the vehicle impact clause. *See id.* at 952, 823 N.Y.S.2d 786. The Third Department modified and affirmed the trial court's decision, holding that the defendant was "liable only for actual damages to the structures and/or personal property on the premises but not for damages stemming from contamination of the ground and groundwater." *See id.* at 953–54, 823 N.Y.S.2d 786.

Since the plaintiff in *White* was able to recover because of the extended coverage provided under the vehicle impact clause—not because the damage resulted from a storage tank—the limited grounds on which the court found liability do not apply here. Indeed, interpreting policy language similar to the language excluding coverage for land at issue here, the *White* court found that, irrespective of the cause of the contamination, the plaintiff's policy expressly excluded coverage for damage to land, and therefore, there was no coverage for remediation costs related to the land. The Policy here, as in *White*, specifically excludes coverage for losses to land and thus Plaintiff's remediation costs for such losses are limited to those expressly provided for in the Extensions of Coverage.

Accordingly, this Court holds, as a matter of law, that the Policy language is unambiguous and therefore warrants granting summary judgment for the Defendants.[6]

## IV. CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment is GRANTED and Plaintiff's cross-motion

---

5. Since Plaintiff does not seek costs for damage to the storage tank itself, this Court finds the question of whether the storage tank constitutes a fixture to be irrelevant to resolving the instant dispute.

6. Since Defendants are entitled to summary judgment as a matter of contract interpretation, this Court need not reach Defendants' alternative argument that Plaintiff is limited to the $20,000 amount it stated in its proof of loss. *See* Def. Mem. of Law at p. 17.

for summary judgment is DENIED. The Clerk of the Court is directed to terminate docket entry numbers 12 and 16 and to close the case.

*It is so ordered.*