**Manuel KITROSSER and Esther Kitrosser a/k/a Manny and Esther Kay, Plaintiffs,**

**v.**

**The CIT GROUP/FACTORING, INC., Defendant.**

**No. 93 Civ. 5699 (DLC).**

United States District Court, S.D. New York.

Jan. 23, 1995.

Donald Stuart Bab, Bryan, Levitin & Bab, New York City, for plaintiffs.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for defendant; Kurt J. Wolff, Diane B. Kaplan, of counsel.

*OPINION & ORDER*

COTE, District Judge:

This action involves the contractual relationship among the plaintiffs Manuel and Esther Kitrosser, also known as Manny and Esther Kay ("Mr. Kay," "Mrs. Kay," or "the Kays"), two corporations formed by Mr. Kay known as Top Form Mills, Inc. ("Top Form") and Top Blush Corporation ("Top Blush") (collectively referred to as "the Corpora-

tions"), and the defendant The CIT Group/Factoring, Inc. ("CIT"). From 1971 until July 1988, CIT provided lending and factoring services to the Corporations. To obtain funds from CIT, the Kays both signed guarantee agreements and pledge agreements pursuant to which the Kays advanced collateral to CIT to secure funds advanced to the Corporations. In 1988, the Corporations filed for bankruptcy and, in 1992, CIT liquidated the Kays' collateral to satisfy the outstanding debts of the Corporations.

On September 16, 1993, the Kays brought this action alleging that CIT wrongfully withheld the collateral. The Kays seek to recover the value of the collateral, as well as consequential and punitive damages. CIT has, in turn, brought counterclaims against the Kays to recover monies due under the guarantees signed by the Kays and to recover attorney's fees and costs related to this action. Discovery closed on March 15, 1994, and CIT has brought a motion for summary judgment seeking dismissal of all of plaintiffs' claims and judgment if favor of CIT on its counterclaims. The Kays oppose CIT's motion, and argue instead that the Court should enter a judgment in favor of the Kays on at least a portion of the claims asserted. Although the Court is unable to determine on the record as it stands the exact balance of the Kays' debt, or alternatively credit, with CIT, thus preventing the Court from deciding the motion for summary judgment in its entirety, the motion does present three issues that this Court can resolve on summary judgment and which will significantly reduce the scope of this action.

## SUMMARY JUDGMENT

The Court may not grant summary judgment unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. Resolving a motion for summary judgment involves a two step process. First, in reviewing the factual background, "the court's focus is on issue-finding, not on issue-resolution." *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993). In any

area in which there are disputed issues of fact, the court must construe those facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Second, the Court must look to the merits of the action, and may grant summary judgment only if the moving party is still entitled to judgment as a matter of law after construing all disputed issues in the non-movant's favor.

To evaluate the rights of the parties to a contract in the context of a summary judgment motion, the Court must first determine as a matter of law whether the terms of the contract are ambiguous. *See Consarc,* 996 F.2d at 573; *W.W.W. Associates, Inc. v. Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639, 642 (1990). The terms of a contract are unambiguous if no reasonable person could differ as to their meaning. *Consarc,* 996 F.2d at 573; *Seiden Associates, Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992); *Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d at 443, 566 N.E.2d at 642. A contract is not ambiguous merely because the parties assert conflicting interpretations. *Seiden,* 959 F.2d at 429. If the Court determines that a contract is unambiguous, the Court must enforce the contract by its terms and cannot look to extrinsic evidence to alter or interpret its meaning. *Consarc,* 996 F.2d at 573. In doing so, the Court must read the contract "in a way that ascribes meaning, if possible, to all of its terms." *United States Naval Institute v. Charter Communications, Inc.,* 875 F.2d 1044, 1049 (2d Cir.1989); *Spaulding v. Benenati,* 57 N.Y.2d 418, 456 N.Y.S.2d 733, 756, 442 N.E.2d 1244, 1267 (1982). Where the contract is found to be ambiguous, however, the Court must resolve any ambiguities in favor of the non-moving party and allow the parties to introduce extrinsic evidence of the intended meaning. *Seiden,* 959 F.2d at 430. In such a case, the meaning of the contract becomes a question for the finder of fact. *Williams and Sons Erectors, Inc. v. South Carolina Steel Corp.,* 983 F.2d 1176, 1183 (2d Cir.1993). If, however, the contract is ambiguous but the parties fail to put forth any

extrinsic evidence regarding the parties' understanding, interpretation of the contract remains a question of law for the Court. *Id.* at 1184; *Seiden,* 959 F.2d at 428; *Sutton v. East River Savings Bank,* 55 N.Y.2d 550, 450 N.Y.S.2d 460, 462–63, 435 N.E.2d 1075, 1077–78 (1982).

In this case, the Court has the benefit of an extensive joint statement of facts by which the parties have simplified the issues, and focussed both themselves and the Court on the few areas of dispute. The background provided below is based in large part on this joint statement of facts and the documents referred to in the statement.

■ There is one dispute as to the significance of having a joint statement of facts. The statement includes the following language: "the parties stipulate that the following facts, and any inferences which may fairly be drawn by the Court from the facts, are admitted." CIT asserts that this language modifies the normal summary judgment standard that requires the Court to draw all inferences in favor of the non-moving party, and allows the Court to instead "draw any inference, for or against either party, that is 'fair.'" The Kays dispute this assertion, and the Court is bound to agree. Any inferences that may be drawn from the agreed statement of facts must go in favor of the non-moving party.

## BACKGROUND

Mr. Kay, who is now approaching eighty years old, has spent his entire career in the garment business. In 1971, Mr. Kay purchased Top Form, then known as T.F.Y. Enterprises, Inc., from F.W. Woolworth & Co. From 1971 through 1985, Top Form had sales in the range of $15 million. In 1985, Mr. Kay formed Top Blush to purchase a third corporation and to act as a label for higher priced merchandise. Unlike Top Form, Top Blush was essentially a trade name, and did not have any physical assets. It is Mr. Kay's purchase of Top Blush that appears to have lead to the ultimate demise of Top Form, Top Blush, and Mr. Kay's lifelong work. After a series of set-backs, Top Form and Top Blush filed for bankruptcy on July 13, 1988, and were subsequently dissolved. CIT's role in this history, and the actions that give rise to this suit are described below.

### A. CIT's Agreements with Top Form and Top Blush

Shortly after Mr. Kay's purchase of Top Form, on December 15, 1971, Top Form entered into a factoring agreement with CIT, then known as Meinhard–Commercial Corporation. In its most basic form, this agreement provides that CIT will purchase Top Form's accounts receivable for customers whose credit has been approved by CIT. For accounts that CIT purchases, CIT accepts the risk of non-payment based on the customer's inability to pay. CIT does not, however, accept the risk of non-payment based on any claim, defense, or offset that the customer has against Top Form. In return, CIT withholds a one-percent commission on all accounts factored. In addition, the agreement gives CIT the right

in [CIT's] discretion, to withhold a reserve, and to revise it from time to time if in [CIT's] judgment it is necessary to protect [CIT] against possible returns, claims or defenses of customers, any indebtedness owing by [Top Form] to [CIT], or any other contingencies.

Thus, Top Form did not have an unqualified right to receive payment immediately for all accounts factored through CIT. To secure any potential claims against Top Form, the agreement provides that CIT shall hold a security interest in all of Top Form's existing and future accounts receivable and in all rights and goods relating to Top Form's accounts receivable.

To account for the various payments and charges, CIT maintains an account on Top Form's behalf. The account is credited with the value of all sales made by Top Form and factored by CIT (as evidenced by Top Form's invoices) and any other amounts due to Top Form. Debits to the account are made based on (i) monies paid to Top Form for accounts purchased by CIT, (ii) CIT's one-percent commission on the accounts factored, (iii) charge-backs from customers based on claims, defenses or offsets against

Top Form, and (iv) interest charged to Top Form for delinquent accounts (limited as of 1985 to interest on up to 60 days of delinquency). CIT then charges or pays interest on the account balance at a rate that was originally two and one-half percent above prime, and was subsequently reduced to one and one-half percent above prime.

To further secure any debt accruing in Top Form's factoring account, CIT obtained from Top Form two security agreements. On December 16, 1971, Top Form entered into a security agreement with CIT that granted CIT a security interest in all of Top Form's merchandise and inventory. On March 15, 1974, Top Form entered into a second security agreement with CIT, which granted CIT a security interest in Top Form's machinery, equipment, furnishings and fixtures, wherever located.

In addition to the factoring agreement, CIT advanced two loans to Top Form. The first loan, entered into on December 9, 1980, provided Top Form with $800,000. This loan was secured by (1) the property described in Top Form's March 15, 1974 security agreement, (2) $1.2 million in life insurance policies on the lives of Kenneth Kay, Ira Kay, and Manny Kay, (3) a mortgage on a factory in North Carolina owned by Top Form, (4) collateral expressed in an intercreditor agreement among CIT, the Economic Development Administration ("EDA"), and the Small Business Administration ("SBA") including a security interest in Top Form's factory located in Pennsylvania, and (5) all collateral expressed in the December 1971 factoring agreement. In addition to this security, the loan was 90 percent guaranteed by the EDA. At the same time as CIT made this loan, the EDA provided Top Form with a $1 million term loan. This $1 million loan was guaranteed by Mr. Kay. The second loan from CIT to Top Form was provided on June 18, 1984. Under this loan, CIT advanced Top Form $263,844 for the purchase of knitting machines. This loan was fully repaid as part of a refinancing in 1987 or 1988.

Soon after Mr. Kay purchased Top Blush in 1985, CIT and Top Blush entered into a factoring agreement that was substantially similar to the agreement entered into by Top Form. On June 16, 1986, Top Form and Top Blush entered into cross-guarantees. In addition to unconditionally guaranteeing the other corporation's debt and obligations, the guarantees provided that:

> Any balances on [CIT's] books standing to the credit of the undersigned [Top Form or Top Blush] shall be considered as pledged to [CIT] as security for the aforementioned indebtedness and obligations owing to you by the Account [the second corporation]. Such balances may be applied, offset or otherwise transferred by you at any time and from time to time without notice to the undersigned in payment or reduction of any indebtedness or obligations owing to you by the Account.

Thus, pursuant to the cross-guarantees, CIT could at any time offset a credit in one of the corporation's accounts against a debit in the other's account.

### B. CIT's Agreements with the Kays

At the same time as Top Form entered into the factoring agreement with CIT in 1971, Mr. Kay signed a guarantee, which in essence provides that Mr. Kay:

> unconditionally guarantee(s) to you [CIT] prompt payment in full of all indebtedness and obligations of [Top Form] now and hereafter owing to you, however arising, [and] the performance of all its obligations under its factoring contract as now written or as subsequently amended, ... together with all costs, attorneys' fees, and expenses incurred by you in protecting or enforcing any obligations or indebtedness owing to you by the Account, defending or prosecuting any actions or proceedings arising out of or relating to any of your transactions with the Account, or incurred by you because of any default hereunder.

Mrs. Kay's first entry into the Top Form–CIT relationship was in 1977. On March 25, 1977, Mrs. Kay entered into an agreement with CIT by which she guaranteed Top Form's obligations under the 1971 factoring agreement. Although there are minor changes in the wording from Mr. Kay's 1971 guarantee, the substantive language is the same as that quoted above. Soon after this, on April 5, 1977, Mr. Kay entered into a new

guarantee agreement that had language that is identical in relevant part to that quoted above. In addition to the language in Mr. Kay's original guarantee, both Mr. and Mrs. Kay's 1977 guarantees provided that:

This guarantee is executed as an inducement to you [CIT] to make funds available to the Account, or to otherwise extend credit to it, in amounts in excess of the amounts available to it through your purchase of its accounts receivable. The undersigned agrees that any such funds which you may make available to the Account or any such credit as you may extend to it shall be in your discretion and shall be deemed to have been made or extended by you in consideration of and in reliance upon this guarantee.

In 1986, the Kays entered into pledge agreements with CIT, whereby each put forth collateral in support of their guarantees of the Top Form factoring agreement. These pledge agreements provided that CIT may

retain all or that portion of the cash collateral and the proceeds from the sale of the securities required to satisfy the indebtedness, obligations or liabilities, plus interest, guaranteed or secured as aforesaid.... In the event the deposited cash collateral and the proceeds from the sale of the securities is insufficient to cover all amounts owing by the Pledgor to CIT, the Pledgor shall remain liable for any deficiency.

Provided that the Pledgors and the Corporations were not in default on any obligations, any cash collateral held under the agreements would accrue interest at a rate one and one-half percent above the prime rate. Mr. Kay entered into his pledge agreement on March 18, 1986, and on June 30, 1988, the value of his cash collateral including accrued interest was $528,396.38. Mrs. Kay entered into her pledge agreement on May 30, 1986, and on June 30, 1988, the value of her stock collateral including accrued interest was $160,963.

## C. Top Form's Financial Difficulties

At some point in 1985 or 1986, Top Form began to experience financial difficulties. In 1987, Ira Kay, then Vice President of Top Form, notified the SBA that Top Form was having difficulties due to (a) a substantial loss in 1986; (b) CIT's reduction of Top Form's advance on receivables from 100 percent to 75 percent; and (c) a flood in Top Form's Pennsylvania sewing facility that resulted in a substantial insurance claim.

In 1987 and early 1988, Mr. Kay attempted to restructure Top Form by reducing expenses, deleting unprofitable lines, and attempting to sell Top Form's mills. In furtherance of this plan, and with the consent of CIT, the EDA and the SBA, Top Form sold its North Carolina mill to a newly formed company owned by Mr. Kay. Funds derived from the sale were used to reduce Top Form's debt to various creditors including CIT.

Although the restructuring of Top Form provided some short term relief, Top Form suffered a further blow in February 1988 when three default judgments were entered against Top Form in New York State Supreme Court. The first, entered on February 1, was for $870,340.05, the second and third, entered on February 8, were for $88,517.54 and $370,214.79, respectively. These judgments were related to the termination of a former principal of the company purchased by Top Blush in 1985. Although the Kays assert that the default was due to the malpractice of their counsel, the judgments were not vacated, and the judgment creditors caused levies to be made upon Top Form's account with CIT. Soon after this, in March or April 1988, CIT reduced Top Form's and Top Blush's advance rate on accounts receivable from 75 percent to zero for Top Form and to 50 percent for Top Blush.

As of July 12, 1988, the judgment creditors had restrained approximately $20,000 in Top Form's operating account and, although Top Blush was not a defendant in the actions that resulted in the default judgments, had restrained approximately $100,000 in Top Blush's operating account. On July 13, 1988, Top Form and Top Blush filed for bankruptcy. The Corporations ceased all operations in August 1988, and in late 1990, their assets were sold and applied to reduce the obligations of CIT, the EDA, and the SBA. The

only funds CIT received from this distribution were $70,696.80, which CIT applied against the factoring account balance, and $120,640.39, which CIT applied against the outstanding balance of the $800,000 term loan. After the distribution of these proceeds to the creditors, and pursuant to a stipulation agreed to by the creditors and the Corporations, on January 18, 1991, the bankruptcy court dismissed the proceedings pursuant to Section 1112(b) of the Bankruptcy Code, 11 U.S.C. § 1112(b), without discharging the Corporations' unpaid debts.

## D. The CIT–EDA Settlement

On January 23, 1991, CIT made a demand on the EDA pursuant to EDA's 90 percent guarantee of the $800,000 term loan (the balance of which was at that time approximately $142,000). After some negotiations during which there was a dispute as to CIT's compliance with the terms of the EDA guarantee, CIT agreed to accept a $50,000 settlement from the EDA. This agreement also provided that CIT would assign to the EDA all of CIT's rights to recover from Mr. Kay the amount the EDA had paid. CIT did not, however, waive its right to collect the remaining balance. In August 1991, counsel for the Kays advised CIT that any settlement discussions with the EDA should include Mr. Kay. CIT rejected this request, but did provide Mr. Kay's counsel with a copy of the proposed settlement. In May 1992, the EDA paid CIT $50,000 pursuant to this agreement. Soon after this, on May 31, 1992, CIT liquidated the Kays' collateral to offset what CIT asserts was an outstanding debit balance in the factoring accounts.

## E. The Account Balances and Liquidation of the Collateral

Although the Court is not prepared at this stage to making a finding as to the exact amount due from or owing to the Kays as a result of the transactions in this case, it is useful to outline the history of the account balance. The joint statement of facts indicates that, as of June 30, 1988—just prior to the Corporations filing for bankruptcy— CIT's records reflect the following account balance:

| | |
|---|---|
| Top Form Debit Balance | ($1,691,811.14) |
| Top Blush Credit Balance | 1,284,639.77 |
| Net Factoring Account Balance | (407,171.37) |
| Top Form Term Loan [1] | ($208,448.72) |
| Total Debt | (615,620.09) |
| Mr. Kay Cash Collateral | $528,396.38 |
| Mrs. Kay Stock Collateral | 160,963.00 |
| Total Collateral | 689,359.38 |
| Net Account Balance | 73,739.29 |

After this date, CIT had chargebacks to the Top Form account in 1988 and 1989 totalling approximately $199,205.72, and incurred expenses and legal fees between 1989 and 1991 of approximately $21,400.88. Amounts credited to Top Form after June 30, 1988 include the checks for $70,696.80 and $120,640.39 received by CIT as proceeds from the Top Form liquidation, which CIT applied to the debit balance and term loan, respectively, and the $50,000 settlement received from the EDA. With these charges and credits (and accounting for interest accruing on the Top Blush credit balance, the Top Form debit balance, the term loan, and the cash collateral), as of May 31, 1992, the Top Form/Top Blush account was approximately as follows:

| | |
|---|---|
| Top Form Debit Balance | ($2,513,615.45) |
| Top Blush Credit Balance | 1,614,569.02 |
| Net Factoring Account Balance | (899,046.43) |
| Top Form Term Loan | ($110,402.26) |
| Total Debt | (1,009,448.69) |
| Mr. Kay Cash Collateral | $814,308.21 |
| Mrs. Kay Stock Collateral [2] | 163,977.89 |
| Total Collateral | 978,286.10 |
| Net Account Balance | ($31,162.59) |

At this point, CIT applied the collateral against the outstanding debt, leaving what it asserts was a $31,000 shortfall.

Based on the balance differences and the charges and credits to the various accounts, from June 30, 1988, through May 31, 1992, CIT credited approximately $329,929.25 in interest to the Top Blush account, and

---

**1.** This amount includes $1,722.72 for June interest on the Term Loan that was not yet indicated in CIT's books, and does not take into account the 90 percent guarantee provided by the EDA.

**2.** In October 1991, CIT sold Mrs. Kay's stock collateral for $155,727.22. From this time until May 31, 1992, when CIT liquidated the accounts, CIT credited this amount with interest as provided by Mrs. Kay's pledge agreement.

charged interest in the amount of $530,500.91 on the Top Form factoring account and $72,-593.93 on the Top Form term loan. If CIT were not entitled to charge postpetition interest on the debts but were forced to pay interest on the Top Blush account balance, as the Kays assert, the net balance after liquidation of the collateral would have been approximately $571,932.25 in favor of the Kays. If no interest were debited or credited in the accounts, the net balance in favor of the Kays would have been approximately $242,003.00.

### F. Objections to CIT's Application of Postpetition Interest

The focus of the Kays' claim against CIT is that CIT should not have charged interest on the Top Form debt after Top Form filed for bankruptcy. Mr. Kay first raised this issue orally on July 25, 1989. CIT's in-house legal counsel advised Mr. Kay that CIT disagreed with this position. Mr. Kay made a similar objection on November 14, 1990. On January 7, 1991, CIT informed the Kays that it intended to liquidate their collateral to offset the net debit balance in the Top Form/Top Blush accounts. By letter dated January 15, 1991, counsel for the Kays implicitly objected to the accrual of postpetition interest (based on counsel's description of the account balances). Again, on February 7, 1991, acting through new counsel the Kays objected to the accrual of postpetition interest on the Top Form debit balance and the Term Loan, as well as post-maturity interest on the Term Loan.[3]

### G. The Complaint and Amended Complaint

As stated above, on September 16, 1993, the Kays filed this complaint, seeking return of their collateral, $750,000 in compensatory damages, and $10 million in punitive damages. The original complaint set forth four causes of action, all predicated on the same facts. These claims are (1) breach of contract, (2) breach of fiduciary duty, (3) conversion, and (4) unjust enrichment. Each of

these claims is based on plaintiffs' assertion that

> Defendant, in intentional and knowing violation of its contractual and fiduciary duty to Plaintiffs, and in willful disregard of Plaintiffs' rights, deliberately and willfully refused to return all or any part of Plaintiffs' collateral and has retained and/or liquidated the same, and applied the proceeds for its own benefit.

In essence, the Kays assert that (1) CIT did not have a right to charge postpetition interest on the debit balance in Top Form's factoring account either to Top Form or to the Kays as guarantors of Top Form's debt, and (2) CIT did not have a right to settle with EDA for less than 90 percent of the term loan balance.

On July 7, 1994, the Kays served on CIT an amended complaint. This complaint altered the language of one paragraph of the facts and added two additional causes of action entitled "Breach of Covenant of Good Faith" and "Commercially Unreasonable Acts," both of which are based on CIT's reduction of Top Blush's advance rate from 75 percent to 50 percent. By a stipulation dated July 15, 1994, the parties agreed that the Kays may file the amended complaint, but reserved CIT's right to argue that the amendments do not relate back to the date of service of the original complaint.

### THE LEGAL ISSUES

Although the Kays have asserted six causes of action and CIT has asserted six affirmative defenses and two counterclaims, the bulk of these claims and defenses are dependent on the resolution of three issues. First, does CIT have a right to collect from the Kays interest on the Top Form/Top Blush factoring agreements and loans for the period after the Corporations filed for Chapter 11 bankruptcy? Second, did CIT's settlement with the EDA for less than 90 percent of the term loan balance also act to reduce the portion of the loan for which Mr. Kay could be held accountable? Finally, do the Kays have standing to assert the claims set

---

**3.** The parties' moving papers do not discuss the issue of whether CIT has attempted to or is allowed to collect post-maturity interest on the

term loan, and therefore, the Court does not address the issue in this opinion.

forth in the amended complaint and does the amended complaint relate back to service date of the original complaint?

## A. Choice of Law

The agreements at issue in this action each contain a choice of law clause, directing this Court to evaluate the rights of the parties according to the laws of New York. The parties do not dispute the validity of these clauses, and each cite primarily to New York case law. In addition, although the Kays are now residents of Florida, each of the agreements was signed in New York, and CIT, Top Form and Top Blush are (or were) each New York corporations. Accordingly, for those issues governed by state law, the Court will look to the law of New York.

## B. Postpetition Interest

The Kays' attempt to avoid liability for postpetition interest on Top Form's debit balance is based on a two part argument. First, the Kays assert that pursuant to Bankruptcy Code Section 502(b)(2) interest ceases to accrue on debt once the debtor files a petition in bankruptcy.[4] Second, the Kays assert that the guarantees held them liable solely for "debts" of Top Form, and because the interest (for the reasons stated above) did not accrue after July 13, 1988, when Top Form entered into bankruptcy, the interest is not a debt of Top Form that the Kays are bound to pay. CIT argues that (i) the bankruptcy proceeding was dismissed, and therefore, the limitation on recovery of postpetition interest is inapplicable, (ii) even if interest did not accrue against Top Form, this does not affect the independent obligation of the Kays under their guarantees, and (iii) if

no interest could be charged on the Top Form debt, then no interest should be credited to the Top Blush credit balance. As discussed below, I conclude that postpetition interest does "accrue" on all prepetition debt even though that interest cannot be charged against the assets of an insolvent estate if the debt is unsecured or undersecured, and when the bankruptcy petition is dismissed without discharge, the debt and postpetition interest continues to be an obligation of the debtor and consequently an obligation of the guarantors. Because the Top Form and Top Blush bankruptcies were dismissed without discharge it is unnecessary to determine whether the Kays would be liable for postpetition interest regardless of the Corporations' liability.

## 1. General Overview of Bankruptcy Proceedings

 In evaluating whether postpetition interest accrues on prepetition debt of a debtor in possession under Chapter 11, it is useful to start with a brief overview of the structure of a Chapter 11 proceeding. Chapter 11 provides a debtor who has become insolvent the opportunity to reorganize and continue as a going business. A voluntary Chapter 11 proceeding begins with the debtor filing a petition with the bankruptcy court. Along with this petition, the debtor must list all creditors, and pursuant to Section 501(a), these creditors may file a proof of claim with the bankruptcy court.[5] If a creditor files a claim and a party in interest objects to the claim, the court must review the claim and shall allow the claim unless it meets one of a number of exclusions. 11 U.S.C. § 502(a), (b). Among the excluded claims under Sec-

---

4. Prepetition debt can fall into three categories, unsecured, undersecured, and secured. Section 506(b) provides an exception to the rule in Section 502(b)(2) for debt that is oversecured, that is, when the value of the property held as security for the claim exceeds the amount of the claim. For the purposes of Section 502(b)(2), undersecured and unsecured debt are treated the same. *See United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 373, 108 S.Ct. 626, 631, 98 L.Ed.2d 740 (1988).

Although one could argue based on the June 1988 statement of account noted above that CIT

was oversecured at the time of the bankruptcy filing, the Kays dispute this issue and thus the Court will treat CIT's claim as undersecured for the purposes of this motion. Moreover, even if CIT may have had a secured claim, CIT did not file a notice of claim in the bankruptcy court proceeding or receive a valuation of the collateral pursuant to Bankruptcy Rule 3012.

5. Pursuant to Section 1111, a proof of claim is deemed to be filed if the claim appears on the debtor's schedule of assets and liabilities that the debtor is required to file pursuant to Section 521 of the Bankruptcy Code.

tion 502 is a claim for "unmatured interest," *i.e.*, postpetition interest on prepetition debt. *Id.* § 502(b)(2); *but see id.* § 506(b) (permitting oversecured creditors to obtain postpetition interest). Thus, an undersecured or unsecured creditor may not seek to recover postpetition interest from the debtor through the bankruptcy proceeding.

After the commencement of the bankruptcy action, the debtor (or after a period of time the creditors) may propose a plan of reorganization under which the debtor will repay some portion of the claims filed against it. If the creditors accept the plan under the conditions provided in Section 1126, and the plan meets the requirements of Section 1129, the bankruptcy court will confirm the plan. The primary effect of confirmation is, as set forth in Section 1141, to discharge the debts of the debtor and to preclude creditors from bringing actions in an attempt to collect those debts.

■■■■■ In certain circumstances, however, filing a plan under Chapter 11 does not result in the discharge of debts. First, Section 1141(d)(2) provides that the debtor is not relieved of certain debts specified in Section 523 of the Code, including certain tax liabilities and debts incurred through fraud. Second, Section 1141(d)(3) precludes the discharge of debts if the plan of reorganization does not meet the rehabilitation goals of Chapter 11. Specifically, Section 1141(d)(3) precludes any discharge if

(A) the plan provides for the liquidation of all or substantially all of the property of the estate; [or]

(B) the debtor does not engage in business after consummation of the plan....

*Id.* § 1141(d)(3).[6] Finally, the debtor obtains no relief if the Chapter 11 proceeding is dismissed pursuant to Section 1112(b) without confirming a plan of reorganization. Subsection (a) of Section 349 of the Bankruptcy Code, which describes the effect of dismissal of a bankruptcy petition, provides that the debtor is not precluded from filing a new petition at a later date and gaining discharge of those debts that were discharge-

able in the case dismissed. Implicit in this provision is the rule that debts are not discharged upon dismissal of a proceeding. *See In re Nash*, 765 F.2d 1410, 1413 (9th Cir. 1985) (noting that pursuant to Section 349, unless the court otherwise orders, dismissal is without prejudice and without discharge); H.R.Rep. No. 595, 95th Cong. 1st Sess. 338 (1977) and S.Rep. No. 989, 95th Cong., 2d Sess. 48–49 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, at 5834–35, 6294 (noting that subsection (a) applies only to predischarge dismissals).

In the case of Top Form and Top Blush, the United States Trustee moved, apparently pursuant to Section 1112(b), to have the action either dismissed or converted to a Chapter 7 liquidation. Because all of the property of the Corporations was subject to valid liens or security interests and all of the property had been liquidated, on January 18, 1991, the bankruptcy court dismissed the petitions without providing for the discharge of any debts.

## 2. Postpetition Interest on Nondischarged Debt

As stated above, Sections 502(b)(2) and 506(b) provide that an unsecured or undersecured creditor cannot recover interest on a debt for the period after the debtor files a petition for bankruptcy. In *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), the Supreme Court set forth three primary justifications for the denial of postpetition interest in bankruptcy actions.

(1) Since "the power of the debtor to pay even his contractual obligations is suspended by law," imposition of postpetition interest is tantamount to a penalty because of a delay in payment necessitated by law, and therefore, is not generally permitted. *Id.* at 163, 67 S.Ct. at 240.

(2) Denying postpetition interest avoids "the administrative inconvenience of continuous recomputation of interest causing recomputation of claims." *Id.* at 164, 67 S.Ct. at 240.

---

**6.** These exceptions comport with Section 727(a)(1), which provides that in a liquidation

proceeding the debts of a corporate debtor are never discharged.

(3) By denying postpetition interest, "different creditors whose claims bore different interest rates or were paid by the bankruptcy court on different dates would suffer neither gain nor loss caused solely by delay." *Id.*

Notwithstanding these considerations, there are situations in which Congress and the courts have found it appropriate to impose upon a debtor liability for postpetition interest.

■ One situation in which the debtor is required to pay postpetition interest on unsecured or undersecured debt is when the debtor in a bankruptcy reorganization is found to be solvent. In *Vanston,* the Supreme Court relied on equitable considerations to support this rule. *See Vanston,* 329 U.S. at 164, 67 S.Ct. at 241 ("where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the [under]secured creditor rather than to the debtor"); *see also Bruning v. United States,* 376 U.S. 358, 362 n. 4, 84 S.Ct. 906, 909 n. 4, 11 L.Ed.2d 772 (1964) (" 'if as a result of good fortune or good management, the estate proved sufficient to discharge the claims in full, interest as well as principal should be paid' " (quoting *American Iron & Steel Manufacturing Co. v. Seaboard Air Line Railway,* 233 U.S. 261, 266, 34 S.Ct. 502, 504, 58 L.Ed. 949 (1914))).

■ In the current Bankruptcy Code, this rule is codified in Section 726(a)(5). Section 726(a)(5) provides that in a Chapter 7 liquidation proceeding, prior to funds being returned to the debtor, unsecured creditors are afforded the right to "payment of interest at the legal rate from the date of the filing of the petition." Although the requirements of Chapter 7 are in general not applicable to Chapter 11 proceedings, *see* 11 U.S.C. § 103(b), Section 726 does apply through the requirements of Section 1129. Section 1129 sets forth the conditions necessary for the bankruptcy court to approve a plan of reorganization and, according to this provision, a creditor need not accept less pursuant to a plan of reorganization than the creditor would receive in a liquidation proceeding. 11 U.S.C. § 1129(a)(7)(A)(ii); *see also United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 379, 108 S.Ct. 626, 634–35, 98 L.Ed.2d 740 (1988) (noting that Section 726(a)(5) expressly provides for the recovery of postpetition interest if the debtor is solvent). Thus, if a debtor in possession has sufficient assets to pay all debts plus pay postpetition interest, the creditors may require that the debtor do so. This rule alone appears to mandate a finding that interest continues to accrue during the pendency of a bankruptcy proceeding, and will be imposed if appropriate. There is, however, a much stronger argument for the imposition of postpetition in this case—the rule set forth in *Bruning v. United States,* 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772.

In *Bruning,* the Supreme Court addressed the question of whether the United States is entitled to recover postpetition interest from an individual debtor on a tax assessment that was not discharged in the bankruptcy proceeding even though the United States could not assert a claim for interest against the bankruptcy estate. *See id.* at 358, 84 S.Ct. 906. There are three significant aspects to the *Bruning* decision. First, the Court altered the rationales for denying postpetition interest in the general reorganization case; second, the Court clarified in unmistakable terms the difference between the nonaccrual and nonpayment of postpetition interest; and finally, the Court set forth a rule imposing postpetition interest on nondischarged debts.

In deciding that the debtor continued to be liable for the postpetition interest after the close of the bankruptcy petition, the Supreme Court first took note of the reasons for disallowing postpetition interest in general. Summarizing the second and third rationales set forth in *Vanston* as quoted above, the Court stated that

> [t]he basic reasons for the rule denying postpetition interest as a claim against the bankruptcy estate are *the avoidance of unfairness* as between competing creditors and *the avoidance of administrative inconvenience.*

*Bruning,* 376 U.S. at 362, 84 S.Ct. at 908–09 (emphasis added). Conspicuously absent

from this discussion was any mention of the penalty issue discussed in *Vanston*. In contrast, the Court in *Bruning* noted that "in most situations, interest is considered to be the cost of the use of the amounts owing a creditor and an incentive to prompt repayment and, thus, an integral part of a continuing debt." *Id.* at 360, 84 S.Ct. at 908.

After setting out the reasons for denying claims for postpetition interest in the typical reorganization case, the Court set forth the basic rule that interest continues to accrue on all debts during the pendency of the bankruptcy even though the creditor may not collect the interest from an insolvent estate. Quoting *American Iron & Steel*, 233 U.S. at 266, 34 S.Ct. at 504, the *Bruning* Court stated:

> 'as a general rule, [once the debtor enters bankruptcy] interest thereafter accruing is not allowed on debts payable out of the fund realized by the sale of the property. But that is *not because the claims had lost their interest-bearing quality* during that period, but is a necessary and enforced rule of distribution, due to the fact that in cases of receiverships the assets are generally insufficient to pay debts in full. . . . But the rule *did not prevent the running of interest during Receivership* . . . .'

*Bruning*, 376 U.S. at 362 n. 4, 84 S.Ct. at 909 n. 4 (emphasis added). Going on to quote Collier, the Court stated:

> 'The principle that interest stops running from the date of the filing of the petition in bankruptcy should be understood as a rule of liquidation practice rather than as a rule of substantive law.'

*Id.* (quoting 3 Collier, Bankruptcy 1858 (14th ed. 1961)).

**7.** After reviewing the rationales for denying creditors the right to collect postpetition interest, and after considering the exception created in *Bruning*, a number of courts have extended the rule beyond nondischargeable tax liabilities to cover other debts that are not discharged during the bankruptcy proceeding. *See In re Shumate*, Nos. 90–2026, 90–2155, 90–2166, 1992 WL 4849, at \*\*5 (4th Cir.1992) (unpublished decision) (allowing creditor to recover postpetition interest on debt that was held nondischargeable pursuant to Section 523), *cert. denied,* —— U.S. ——, 112 S.Ct. 2947, 119 L.Ed.2d 571 *and cert. denied,* ——

◼ Returning to the issue before it, the Supreme Court determined that when seeking to recover postpetition interest from a debtor on a debt that had not been discharged through the bankruptcy proceeding, the rationales for denying postpetition interest no longer apply. In that situation, the need to calculate the postpetition interest does not inconvenience the administration of the bankruptcy case and will not delay or reduce the payments made to other creditors. *See id.* at 363, 84 S.Ct. at 909. In contrast to the Court in *Vanston*, which viewed postpetition interest as a penalty on the debtor, the Court in *Bruning* saw a denial of postpetition interest as a windfall to the debtor that should be permitted only when necessary to effectuate the orderly and fair administration of the bankruptcy proceeding. Thus, the only Supreme Court case that has discussed the distinction between *accrual* and *denial* of postpetition interest has stated that postpetition interest continues to accrue against a debtor, even on undersecured debt, but is not collectable against the estate. If, however, the debt is not discharged in the bankruptcy action, the debtor continues to be liable for both the debt and interest that accrued during the pendency of the action. *Id.*[7]

To support the position that Section 502(b)(2) stops the accrual of interest, the Kays cite primarily to *Vanston*. In discussing the denial of postpetition interest, the Supreme Court stated, "[t]he general rule in bankruptcy and in equity receivership has been that *interest* on the debtor's obligations *ceases to accrue* at the beginning of proceedings." 329 U.S. at 163, 67 S.Ct. at 240 (emphasis added); *see also In re Ionosphere Clubs, Inc.*, 134 B.R. 528, 531 (Bankr. S.D.N.Y.1991) (quoting *Vanston* without

U.S. ——, 113 S.Ct. 112, 121 L.Ed.2d 69 (1992); *In re Shelbayah*, 165 B.R. 332, 337 (Bankr. N.D.Ga.1994) (allowing lender to recover from debtor postpetition interest on nondischargeable student loan); *Jordan v. Colorado Student Loan Program*, 146 B.R. 31, 32 (D.Colo.1992) (allowing lender to recover from debtor postpetition interest on nondischargeable student loan); *Members Credit Union v. Kellar*, 125 B.R. 716 (Bankr.N.D.N.Y.1989) (holding nondischargeable postpetition interest on debt that was determined to be nondischargeable under Section 523(a)(2) as obtained by fraud).

comment). *Vanston,* however, involved a dispute over a creditor's right to collect interest on unpaid interest coupons that came due after the debtor entered into receivership. The case did not involve a claim against a debtor on a nondischarged debt after the close of the bankruptcy proceeding. Thus, the case is inapposite to the issue before this Court. Moreover, the Supreme Court in *Vanston* went on to state in more general language that, "[s]imple interest on secured claims accruing after the petition was filed was denied unless the security was worth more than the sum of principal and interest due." *Vanston,* 329 U.S. at 164, 67 S.Ct. at 240. Thus, not only is *Vanston* not applicable to the facts before the Court today, *Vanston* itself recognized that there are circumstances in which postpetition interest does accrue.

Plaintiff also argues that *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 supports the position that interest ceases to accrue upon filing a petition for bankruptcy. The creditor in *Timbers* held an undersecured claim against the debtor on a loan for an apartment complex. The creditor sought to obtain postpetition payments from the debtor in excess of the value of the security interest in order to compensate the creditor for the "use value" of the collateral (the apartment complex). The right to postpetition interest was not directly at issue in *Timbers,* and the Court discussed Section 506 and the rules on postpetition interest only by analogy to the situation in that case. Moreover, *Timbers* involved an ongoing reorganization, and did not address the issue of interest on nondischarged debts of a liquidated estate. In describing Section 506, the Court merely stated that this provision has the "substantive effect of denying undersecured creditors postpetition interest on their claims." *Id.* at 372, 108 S.Ct. at 631. At no time did the *Timbers* Court state that postpetition interest does not accrue.

In this action the Court faces the situation in which the underlying debt has not been discharged due to the dismissal of the bankruptcy action. Although the Kays argue that

the dismissal of the Corporations' bankruptcy petitions is of no significance in determining whether CIT has a right to postpetition interest, the opposite is true: the dismissal of the petitions without discharge is determinative of the issue. Just as the Supreme Court held in *Bruning,* and subsequent courts have held in applying the holding in *Bruning,* allowing a creditor to recover postpetition interest from a debtor after the dismissal of a bankruptcy petition will not conflict with the considerations that support the general denial of postpetition interest within bankruptcy actions. In addition, the legislative history of subsection (b) of Section 349 indicates that Congress' goal upon dismissal of an action is to "undo the bankruptcy, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case." H.R.Rep. No. 595, at 338 and S.Rep. No. 989, at 48–49, *reprinted in* 1978 U.S.C.C.A.N. at 5834–35, 6294. Thus, allowing recovery of postpetition interest on debts when a bankruptcy action is dismissed not only comports with the rationale set forth in *Bruning* but also follows the mandate of Congress that dismissal of a bankruptcy action should act to erase the effects of the petition to the extent possible.

On the basis of this analysis, I hold that interest on Top Form's factoring account debit balance and Top Form's term loan continued to accrue during the pendency of the bankruptcy petition, and although CIT could not assert a claim against the bankruptcy estate for such interest, it continued as a debt of Top Form, and upon dismissal of the bankruptcy petition and in the absence of the discharge of the debt, CIT could have asserted a claim against Top Form for both the debit balance and any interest accruing on that balance. Accordingly, to the extent that the Kays are liable for any debts of Top Form, they are liable for both the debit balance and any interest accruing on that balance until such time as they satisfy the debt.

**3. The Kays' Liability for Postpetition Interest**

█ Based on the above analysis of the Corporations' continuing liability for postpe-

tition interest, it is necessary to discuss the Kays' guarantees and pledge agreements only briefly. As described above, the guarantees are "unconditional" and subject the Kays to liability for all "indebtedness and obligations" of Top Form. Because the debit balance and postpetition interest continued as debt of Top Form, the Kays continue to be liable for this obligation. Accordingly, CIT acted well within its rights in liquidating the Kays' collateral.

## C. The CIT–EDA Settlement

■ The Kays' second basis for asserting that CIT has wrongfully liquidated the Kays' collateral is that CIT improperly settled with the EDA for less than the full amount of the EDA's guarantee and unlawfully assigned to the EDA CIT's rights against Mr. Kay as guarantor of the term loan. As a result, the Kays argue that their obligation to CIT must be reduced by the difference between the full value of the EDA guarantee and the amount for which CIT settled.

CIT asserts in its brief, an assertion that the Kays do not even attempt to refute, that the holder of a guarantee may settle with one guarantor, or allow the liquidation of other security, without in any way reducing the liability of the remaining guarantors. *See, e.g., North Fork Bank & Trust Co. v. Thomason Industries Corp.*, 194 A.D.2d 772, 599 N.Y.S.2d 835, 836 (1993); *Manufacturers and Traders Trust Co. v. Tronolone*, 71 A.D.2d 835, 419 N.Y.S.2d 370, 370–71 (1979), *app. denied*, 48 N.Y.2d 612, 425 N.Y.S.2d 1028, 402 N.E.2d 144 (1980). In addition to this general rule, the guarantee signed by Mr. Kay provides that:

> [y]ou [CIT] may, without notice to the undersigned [guarantors], accept and release security, grant extensions, and consent to subordination and compromises without affecting in any manner the undersigned's obligations, which may be enforced before or after proceeding against the Account [Top Form] or against any security granted to you.

Thus, pursuant to the express and unambiguous terms of the guarantee, CIT had the right to release the EDA without affecting Mr. Kay's liability.

CIT also expressly reserved in its settlement agreement with the EDA, its rights to proceed against any other guarantors on the remaining balance.

> Neither this Agreement, nor any of its provisions, is intended in any way to release or acquit, either in full or in part, any other person, entity or guarantor of the EDA Guarantied Loan or any obligor of that loan from any claims, demands or causes of action that CIT now owns or holds, has at any time heretofore owned or held, or may at any time hereinafter own or hold against such person, entity, obligor or guarantor. CIT expressly reserves the right to pursue the various persons, entities, obligors and guarantors and causes of action and relief available against them, except EDA.

*See North Fork Bank*, 194 A.D.2d 772, 599 N.Y.S.2d at 836 (settlement with guarantor does not discharge co-guarantor when creditor expressly reserves rights against co-guarantor); *see also* N.Y. General Obligations Law § 15–104. Thus, in settling with the EDA, CIT acted within its rights as expressly provided by the guarantee and did not compromise its rights with regard to Mr. Kay.

In their memorandum of law, the Kays do not argue against CIT's general right to settle with the EDA without affecting CIT's right to proceed against Mr. Kay. Instead, the Kays assert that CIT improperly assigned to the EDA CIT's right to proceed against Mr. Kay to collect the $50,000 that the EDA did pay. CIT asserts in turn that the guarantee agreement expressly provided CIT with the right to subordinate the EDA. Although the Kays place great emphasis on this issue, it is irrelevant to the issues before the Court in this action. Whether the EDA can assert a claim against the Kays to recover the $50,000 paid to CIT is wholly unrelated to whether CIT can collect from the Kays under the guarantee agreements. The EDA has not, that this Court is aware of, asserted a claim against the Kays, has not appeared in this action, and has not taken a position on the issue. Thus, any ruling on this issue would be nothing more than dictum.

## D. The Amended Complaint

On July 7, 1994, the Kays served on CIT an amended complaint. As noted above, this complaint added two additional causes of action and altered the facts in one paragraph of the background statement. CIT did not oppose the filing of this amended complaint, but did reserve the right to argue that the new allegations contained therein do not relate back to the date on which the original complaint was filed. CIT now asserts in its motion for summary judgment that (i) the Kays do not have standing to assert the new claims, (ii) the new claims do not relate back to the original filing date, and (iii) even if the new claims do relate back, the claims can be disposed of on summary judgment. Because the new claims are sufficiently distinct from those asserted in the original complaint that they do not relate back and are thus time barred, it is unnecessary to address the question of whether the Kays have standing or to address the merits of the Kays' new claims.

### 1. The New Claims

The amended complaint contains two new causes of action and restates Paragraph 12 of the background facts. Paragraph 12 in the original complaint alleges that:

12. In June of 1988, without any prior notice, CIT/Meinhard reduced the level of its advances against shipments, to *Top Form, from the previous levels of 100% or 90% of shipments, to 70% thereof,* which action Defendant knew would have the effect, and which in fact did have the direct and immediate effect of depriving *Top Form* of a substantial portion of the operating capital upon which it relied in the ordinary course of its business, and thus causing it to be unable to pay its bills as they matured (emphasis added).

The amended complaint alters this paragraph to read as follows:

12. In June of 1988, without any prior notice, CIT/Meinhard reduced the level of its advances against shipments, to *the Corporation, from the previous levels to 50% of Top Blush's shipments,* which action Defendant knew would have the effect, and which in fact did have the direct and immediate effect of depriving *the Corporation* of

a substantial portion of the operating capital upon which it relied in the ordinary course of its business, and thus causing it to be unable to pay its bills as they matured (emphasis added).

Thus, the allegation in the complaint changed from a assertion that CIT wrongfully reduced the advance rate to Top Form, which was at that time indebted to CIT for over $1.9 million, to an assertion that CIT wrongfully reduced the advance rate to Top Blush, which at that time had an account balance in Top Blush's favor of approximately $1.3 million—although Top Blush's cross-corporate guarantee left a net deficit of approximately $600,000.

The first new cause of action asserts that CIT's reduction in Top Blush's advance rate constituted a breach of CIT's duty of good faith implicit in the factoring, pledge and guarantee agreements, and caused the Corporations to go out of business. As a result of this wrongful act, the Kays assert that CIT is precluded from seeking to recover under the guarantees and must pay the Kays the value of the Corporations' lost business.

The second new cause of action asserts that CIT's actions breached its obligations under Section 9–207 of the Uniform Commercial Code ("UCC") to use commercially reasonable care in the custody and preservation of the Kays' collateral. The complaint then asserts that these actions caused the Corporations to go out of business. Although the complaint is unclear as to exactly what the Kays are asserting in this claim, the Kays' memorandum of law in opposition to CIT's motion for summary judgment appears to argue that (i) UCC Section 9–207 creates a fiduciary duty to preserve the value of the collateral, (ii) CIT's reduction of Top Blush's advance rate was a commercially unreasonable act that CIT knew would cause the corporations to go out of business, thereby allowing CIT to liquidate the collateral, and (iii) CIT has thereby breached its fiduciary duty under UCC Section 9–207 and is liable for damages resulting therefrom. As such, this claim like the fifth cause of action, is dependent on a finding that CIT's reduction of Top Blush's advance rate was done in violation of CIT's duty to Top Blush.

## 2. Relation Back

Whether or not the Kays have standing to assert the two additional causes of action, the new claims are time barred. Pursuant to Section 213 of the New York Civil Practice Law and Rules ("CPLR"), each of the claims in the Kays complaint must be asserted within six years of the underlying breach. As noted above, each of the Kays' new causes of action are dependent on a determination that CIT wrongfully reduced Top Blush's advance rate in March or April 1988. The Kays' original complaint was filed in September 1993, and the amended complaint was filed in July 1994. Thus, in order for the Kays to assert the two new causes of action, the claims must relate back to the filing date of the original complaint.

▇▇▇▇ Pursuant to Rule 15(c)(2), Fed. R.Civ.P., a claim or defense asserted in an amended pleading relates back to the date of the original pleading if it "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." In the alternative, the claims will relate back if "relation back is permitted by the law that provides the statute of limitations applicable to the action." Rule 15(c)(1), Fed.R.Civ.P. Thus, if the New York rule for relation back is more liberal than the federal rule, the Court must look to the New York rule. *See Smith v. Rochester Telephone Business Marketing Corp.*, 786 F.Supp. 293, 309 (W.D.N.Y.1992), *aff'd*, 40 F.3d 1236 (2d Cir.1994).

The New York rule for relation back is similar in language and application to the federal rule. Section 203(f) of the New York CPLR provides that:

> A claim asserted in an amended pleading is deemed to have been interposed at the time the claims in the original pleading were interposed, unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading.

New York CPLR § 203(f). Although there are minor differences in the language between Rule 15(c)(2) and Section 203(f), courts have not focussed on any distinction and have typically cited both rules and applied the federal rule. *See The Travelers Insurance Co. v. 633 Third Avenue Associates*, 14 F.3d 114, 125 (2d Cir.1994); *Smith*, 786 F.Supp. at 309.

A determination as to whether newly asserted claims relate back to the filing of the original complaint depends on "whether adequate notice of the matters raised in the amended pleading has been given to the opposing party 'by the general fact situation alleged in the original pleading.'" *In re Chaus Securities Litigation*, 801 F.Supp. 1257, 1264 (S.D.N.Y.1992) (quoting *Contemporary Mission, Inc. v. New York Times Co.*, 665 F.Supp. 248, 255 (S.D.N.Y.1987), *aff'd*, 842 F.2d 612 (2d Cir.), *cert. denied sub nom.*, *O'Reilly v. New York Times Co.*, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988)). Thus, in determining whether the Kays' new claims relate back, the Court must determine whether the factual allegations set forth in the Kays' original complaint gave CIT adequate notice of the new claims.

The Kays assert that, because the only change to the factual background portion of the complaint was the change in paragraph 12 to substitute Top Blush for Top Form, CIT had adequate notice of the factual basis for the new claims. In addition, Paragraph 13 of the original complaint states that:

> The Corporations were unable to replace the working capital withheld by Defendant, and in July, 1988 the Corporations filed petitions for reorganization in bankruptcy pursuant to Chapter 11.

From paragraphs 12 and 13 the Kays argue that they provided CIT with notice that CIT wrongfully reduced the advance rate to Top Blush. Although the changes in language between the two complaints were simple, the import of the changes is significant.

First, the time frame of the events at issue changed dramatically. The original complaint sought damages solely due to the failure and refusal of CIT to return the collateral to the Kays in 1991. The claims in the original complaint were breach of contract, breach of fiduciary duty, unjust enrichment, and conversion. The bases of the Kays' claims were, as addressed above, that CIT did not have a right to postpetition interest

and did not have a right to settle with the EDA. Thus, the events at issue in the original complaint began in 1991. In contrast, the new claims seek to recover damages (or avoid payment of amounts due) based on CIT's wrongful conduct toward Top Blush in April 1988.

Second, the original complaint did not require any investigation into the financial condition of the Companies, or the cause of their demise. The amended complaint, in contrast, would require a determination of whether CIT's actions caused the failure of the Companies. This would require reopening discovery, which closed in March 1994, and would likely result in each side retaining experts to testify as to the effect on Top Blush and Top Form of CIT's actions and the reasonableness of those actions in the context of the Corporations' financial difficulties. Moreover, the documents that would need to be produced and analyzed during the period of discovery are significantly different than those required to respond to the original complaint. The original complaint depended solely on financial documents within the control of CIT—documents going to the balance in the factoring accounts and the pledge accounts. The amended complaint would require discovery of the financial records of the Companies, which were liquidated in 1990 and which have apparently been dissolved by proclamation of the New York Secretary of State for non-payment of taxes.

Finally, by simply changing paragraph 12 from a discussion of Top Form to a discussion of Top Blush, the Kays have inserted a transaction entirely absent from the original complaint. This directly contravenes the requirements of Rule 15(c)(2), which requires that the new claim arise out of a transaction set forth in the original complaint.

Thus, even if the Kays have standing to assert the new claims against CIT, these claims do not relate back to the original filing date and are therefore time barred. Accordingly, the Kays' fifth and sixth causes of action are dismissed with prejudice.

## CONCLUSION

CIT's motion for summary judgment is granted in part—CIT acted within its rights in liquidating the Kays' collateral to cover Top Form's factoring account debit balance, including postpetition interest and the outstanding balance of the term loan. In addition, the Kays' fifth and sixth causes of action as set forth in the amended complaint are time barred and are therefore dismissed with prejudice.

SO ORDERED.